T.E.A.M. Entertainment Inc. v. Douglas, et al.
A Comparison of the Sony/Noontime Relationship to
the Universal Music/Murder, Inc. Relationship

Prepared for Doman Davis LLP by



The Moses Avalon Company

1864 N. Vermont Ave
#540
LA CA 90027
323-665-9318

© 2005 The Moses Avalon Company

## TOC

| | |
|---|---|
| Summary | 3 |
| Section 1: Sony/Noontime v. UMVD/Murder, Inc.: Is It an Apples to Apples Comparison? | 4 |
| 1.1 What Is a "Major Label?" | 4 |
| 1.1.a Functionality | 5 |
| 1.1.b Performance | 6 |
| International Retail Reach | 6 |
| Radio Access | 7 |
| Union Affiliation | 8 |
| Size and Types of Deals | 8 |
| Types of Rights Granted in Contracts | 9 |
| 1.1.c Size | 10 |
| Market Share | 10 |
| Lateral Integration | 11 |
| 1.2 Conclusion: Is It Apples to Apples? | 11 |
| Section 2: What If Ashanti Had Signed To Sony Instead Of Universal? | 12 |
| 2.1 Comparison of Ashanti to Sony Equivalent Artists | 12 |
| 2.2 Additional Capital Based on Lateral Integration | 12 |
| 2.3 Additional Capital Based on Record Sales | 13 |
| Section 3 Final Conclusion: Would Ashanti Have Earned More on Sony? | 14 |
| Professional Biography of Moses Avalon | 15 |
| Appendix i: Documents Reviewed in Connection with This Report | 20 |

Avalon company
The Moses Avalon Company

© July 3rd, 2006

## Summary

I have been retained by the law firm representing T.E.A.M. Entertainment Inc. ("T.E.A.M.") in an action against the recording artist p.k.a Ashanti to examine whether or not the relationship between Sony Music Distribution ("Sony/BMG" or "Sony")/Noontime is comparable to the Universal Music and Video Distribution ("UMVD")/ Murder, Inc. relationship in terms of their capabilities in the international music marketplace.

I conclude that, not only is the comparison of Sony/Noontime to UMVD/Murder, Inc. a equal "apples to apples" comparison generally, but that in this case particularly, Sony's apples are more equal than UNVD's. In other words, Sony and UMVD are equivalent entities in every practical and relevant way concerning the music business in general. However, in the case of Ashanti the conditions under a Sony distribution would likely have afforded her far greater success than under a UMVD distribution.

This report supports relies upon SoundScan data from the Nielson Company, the documents listed in Appendix i and my 26 years of experience in the music business working on projects for major labels as a producer and recording engineer and for the past several years through my work analyzing major label contracts when acting as a music business consultant and artists' rights advocate.



© July 3rd, 2006

## Section 1: Sony/Noontime v. UMVD/Murder, Inc.:
## Is It an Apples to Apples Comparison?

To determine whether the Sony/Noontime relationship and the UMVD/Murder, Inc. are equivalent in terms of market capabilities we must consider their functionality, performance and size. I have defined some industry terms to facilitate this discussion and provide the basic background on how the music industry works.

### 1.1 What Is a "Major Label?"

To make a fair comparison between Sony and UMVD, we must first identify what a "major record company" is and does. A record company is engaged in the production, manufacture, marketing and distribution of records. There are only four entities in entire free world (ignoring China and the former Soviet bloc countries) who have the capacity to do this on a mass scale. They are:

| UMVD | (Universal Music and Video Distribution) |
| | (Formally and sometimes still referred to as "UNI") |
| Sony/BMG | (BMG: Bertelsman Music Group) |
| EMI | (Electric and Musical Industries. Sometimes EMD) |
| WMG | (Warner Music Group) |
| | (Formally and sometimes still referred to as "WEA") |

In fact, one could define a "major label deal" strictly as a deal to create a record that will be distributed by one of these four companies or their wholly owned subsidiaries.

To help create a picture that makes this clear, think about it as four trees with one distributor as the trunk of each tree. At the first branching off of the tree trunk you would have each of the Distributor's major affiliates, which I call "Parent Labels." At the second branching off you would have their imprint labels which I call "One-Deep labels."

Here are three examples:

> 1. From UMVD's trunk comes both Parent Labels Island/Def Jam (IDJ)and Interscope. From Interscope's branch we get the One-Deep labels G-Unit and Aftermath. From the IDJ branch we get the One-Deeps Mercury Records and Murder, Inc.

> 2. From the trunk of Warner Music Group (called WEA) we get the Parent Label, Atlantic Records and from their branch comes the One-Deep label Maverick, the label started by the pop artist Madonna.



© July 3rd, 2006

> 3. From the trunk of Sony/BMG emerges the Parent Labels Columbia Records and Epic Records. And from them you get the One-Deeps DMZ and Noontime respectively.[1]

A family tree of the distribution channels expands every day, with more and more offshoots of labels splitting the branches thinner and thinner until you get to what I call "vanity labels"—small labels that have only one act on them—usually the artist themselves. "Vanity label," "production company" and my term, "Two-Deep label" are often (but not always) essentially all the same thing. An example of a Two-Deep that is a production company would be T.E.A.M.

Now that the terms are defined we will look at a three-pronged analysis:

> 1) Functionality,
> 2) Performance, and
> 3) Size.

## 1.1.a Functionality

To take a talented singer from rehearsing in the basement to a recorded album on the shelves of thousands of record stores requires four basic functions:

> 1. The ability to develop talent
> 2. The ability to market talent
> 3. The ability to maintain a connection to a major distributor
> 4. The ability to get units from a warehouse to the retail store and back with accountability.

(Note the boxes outlined in yellow on page 12 of the Supporting Documents)

While Two-Deep labels such as T.E.A.M. develop talent, they have no direct pipeline to market, promote or facilitate mass production and delivery of that talent. Instead, they rely on One-Deep labels like Noontime or Murder, Inc., who do not develop talent from the ground up, but have the budget from Parent Labels to acquire partially developed talent and bring it to the next level with marketing and promotion of the finished product (a CD in most cases) to the general public.

Distributors such as Sony or UMVD do not develop talent but they do market the titles in their catalog to the retail stores. They apportion goods and

---

[1] When you look at a CD you'll notice that there are several logos on the mirrored surface. These logos make up the pipeline of the act's development and distribution. These same names appear at the base of the TV screen when you watch the group's video. Some examples are "BMG/Arista," and "Sony/Epic/Crescent Moon." Crescent Moon (owned by Emilio Estevez in Miami) is a One-Deep label that acquires talent. That talent is marketed through Epic the Parent Label and distributed through the Distributor, Sony. If Crescent Moon has a deal with smaller entities to find talent for them, then that entity would be a Two-Deep or production company.

© July 3rd, 2006

handle the logistics of getting the records from A to B, collect the money,
deal with crediting accounts and returns of merchandise. While both
Distributors and Parent Labels market an artist, there is a very important
difference between their marketing roles. Parent Labels and One-Deep labels
market the artist to the public while a Distributor markets to the actual
retail stores, getting the buyers of retail outlets to stock the artist's
work. One could say that while labels (both Parent Labels and One-Deep
labels) market the artist as a *personality*, Distributors market the artist
as a *product*. Only with the combination of the four functions can an artist
expect to have success on a mass scale.

**Relevant Conclusion**: In regard to the four key functions both Sony and UMVD
perform exactly the same four functions in more or less exactly the same
way. They both market to the same retail stores, both have marketing
departments of about the same size and use virtually identical methods of
marketing.

## 1.1.b Performance

The second factor in determining whether UMVD and Sony are comparable,
relates to the services they provide to their artists and the rights they
acquire contractually.

### International Retail Reach

While many labels can get CDs to a regional store, only a Big Four
Distributor has the ability to, within the life-span of a single decision,
get hundreds of thousands of units to stores around the world literally
overnight. Both UMVD and Sony have exactly the same retail reach. One can
travel to the farthest corners of the world but you will probably not find a
large retail record store that carries Sony product and not UMVD product or
conversely, UMVD product without Sony's. A list of their retail
relationships was reviewed for this report and is attached in Plaintiffs
exhibits. Notice that while there are some differences in certain stores
that both Sony and UMVD supply to, based on the documents supplied to me the
main outlets for music sales, who make up almost 50% of all retail music
sales in the US, are the same:

BEST BUY
ANDERSON MERCH
BAKER & TAYLOR
CIRCUIT CITY
TARGET STORES
HANDLEMAN COMPANY
TRANSWORLD ENT.
BORDERS GROUP
TOWER STORES
AMAZON.COM
VIRGIN MEGASTORES
COSTCO



© July 3rd, 2006

*Radio Access*

While in theory radio stations can play any song they wish, the financial realties of programming a Top 40 play-list require program directors to "put into rotation" those artists who have the most money behind their promotional efforts. This means almost exclusively major label artists are put into rotation.

Parent labels employ "radio promoters" who specialize in having relationships with program directors of radio Parent labels to those program directors. The cost of this service to each label is about $1,000,000 per song for placement on the play-lists of radio stations all over the US: a service whose cost is far out of reach for anyone but a major concern. While majors complain publicly about the cost of these specialized promoters, covertly they enjoy the fact that *only they can afford such a level of service*. This keeps their chief competitors, so-called "independent labels," off the radio and out of the public eye.

Both Sony and UMVD labels make liberal employ of the services of Radio Promoters and spend in the millions per year on the placement of their artists on radio. The fact that each seems to be very successful in getting majority placement of their artists on the Billboard pop-charts indicates intense effort on the part of both entities to achieve this result.

Recently a New York Attorney General Elliot Spitzer entered into settlement agreements for what has become known as the "payola" or "pay for play" scandal. Certain labels were fined for influencing radio play-lists with financial incentives. It is worth noting for this report that only the Big Four Distributors were required to pay into the settlement fund. The payouts were recorded as being:

Sony/BMG:    $10 million
UMVD:        $12 million
Warner:      $5 million
EMI:         $3.75 million

Note that Sony/BMG and UMVD are within 20% of each other and each is over 200% higher than the other Big Four payments. This is another indicator of the similarity and equality of Sony and UMVD, at least in the eyes of the Attorney General of the State of New York, Elliot Spitzer.

*Union Affiliation*

Major Labels only use union musicians (in fact many major label recording contracts insist that *all* players on the recording be union affiliated) and tend to pay them at least union scale for their performances. They also generally insist that their affiliated (One-Deep) labels use union musicians on the recordings. Production companies however (Two-Deep labels) are rarely under such restrictions. This is one reason that majors have smaller affiliated labels (like Murder, Inc. or Noontime) who make use of even smaller production companies on the "street" level, like T.E.A.M.. Flying



© July 3rd, 2006

under the union radar production companies can record for far cheaper than either the Big Four Distributor or the Parent Labels.

Based on my experience I can state that both UMVD and Sony's wholly owned subsidiary/Parent Labels, IDJ and Epic, have *exactly* this type of relationship with the AFM (American Federation of Musicians) and agree to honor the collective bargaining agreements in place between them and Sony/UMVD respectively.

### Size and Types of Deals

An advance on a Parent Label is rarely less than $300,000 and can be well into the millions. Promotion budgets can also be in the millions per act. However, keeping in mind the relationship outlined in the paragraphs above, Big Four Distributors have Parent Labels that in turn control smaller affiliated "imprint" labels (One-Deeps) which are in essence *talent aggregators*.

In a situation where a One-Deep acquired (or branded) an artist from a Two-Deep, they might "buy-out" the contract from the Two-Deep (such as T.E.A.M.) who originally met the artist, saw promise in them and cultivated their trust. This trust is what will lead to recording the initial demos at the Two-Deep label's own expense.

The One-Deep label after acquiring the act from a production company may then offer to give the artist an advance and spend the millions promoting her if the Parent Label likes the act. However, the money offered is rarely the One-Deep label's. It will be pipelined from the Parent Label (like IDJ or Epic) they report to. Since the One-Deep label (like Murder, Inc. and Noontime) needs to account for its over head they will rarely offer the entire advance to the artist either. Instead, they will take a healthy percentage off the top and adjust the artist's advance to anywhere between $30,000 and $75,000. Such was the case with Ashanti and her deals with both Noontime and Murder, Inc.

To summarize, the chief role of One-Deep labels is to aggregate talent from Two-Deep labels, pipeline the talent to the Parent Label, who then adds their connection to a Big Four Distributor which handles the final function, getting units to the store and handling accounts payable. Thus, the Parent Label and the One-Deep label is, in essence, franchises of the Big Four Distributor.

How have well have both Murder, Inc. and Noontime performed their functions as One-Deep labels: both have impressive track records in the roles of talent aggregation.

Murder, Inc. boasts credits with chart-topping artists like, Ja Rule, Ashanti, Cadillac Tah, Vita, Charlie Baltimore, Black Child, and recently, Lloyd. Noontime's credits are composed of a stable of producers whose roster of acts include hit-makers like Toni Braxton, Aaliyah, Alicia Keys, Montell



© July 3rd, 2006

Jordan, Mariah Carey, Boyz II Men, Whitney Houston, Usher, Kelly Price, and TLC.

These companies track-records combined with the contracts reviewed for this report illustrates the parallelism of both One-Deep labels, Noontime and Murder, Inc.  Although the contract with IDJ/Murder, Inc. is called a "joint venture agreement" and the contract with Sony/Noontime has been referred to as a "label deal" this is a distinction without a difference.

While the Murder, Inc. contract focuses on distribution of existing product and Noontime focuses on development of artists, both are essentially "first look" deals wherein the One-Deeps are finding talent and giving the Parent Label they report to a "right of first refusal" on acquiring said artists.

And while the Sony/Noontime agreement spells out the terms for compensation clearly, the section on the Murder, Inc. contract that outlines the company's compensation was redacted. However, it seems naive to assume that Murder, Inc. is delivering talent to IDJ for free.

Therefore both companies are paid on a performance basis; are getting bonuses for success and are the recipients of recoupable advances for initiation of the relationship. The Sony/Noontime agreement I reviewed even states that one of its artists is currently on Def Jam (2.02a of Sony/Noontime agreement) and that when the Def Jam contract expires, that artist ("Absolute") will then become part of Sony's "first look" rights under the Noontime agreement. A more blatant example of their parallel roles in the acquisition process could not be better illustrated. Therefore the financial relationships between Sony-Epic-Noontime on one hand and UMVD-IDJ-Murder, Inc. on the other are structured in identical ways. The Distributor controls the Parent Label who in turn looks to the imprint label (One-Deep) for new acts who in turn relies on a production company (Two-Deeps), in this case T.E.A.M., to be the first line of selection.

### Types of Rights Granted in Contracts

Since labels that are not part of the family tree of major Distributors (so called "independent labels") don't have the capacity to exploit recordings much further than arms length distribution, they are rarely concerned with getting international rights from artists they sign.  One-Deep Labels conversely are interested in acquiring as many rights as they can convince an artist to grant to them so they can in turn grant those rights to the Parent Label they aggregate for, who in turn must grant those right to the Big Four Distributor who owns them.  In this case, the rights acquired by both Noontime (a One-Deep to Epic which is owned by the Big Four Distributor Sony) are the same as those acquired by Murder, Inc. (a One-Deep to IDJ owned by the Big Four Distributor UMVD.) Both contracts with IDJ/Murder, Inc. and Sony/Noontime acquired these rights and intended to deliver rights on this mass level.

**Relevant Conclusion:** All five points above together: grant of rights, radio access, union afflation, size of deals and retail reach, are only practiced by the Big Four and a very select few "major indies."



© July 3rd, 2006

After doing analysis of countless recording contracts by both Distributors
Sony and UMVD I can state, contracts on labels owned by both Big Four
Distributors read about the same; taking the same rights (both international
and domestic) offering the same size advances; have the same union
requirements, and are equally as aggressive in terms of getting their
artists placed on pop radio rotation, and pipelining capital to their
affiliated labels.

## 1.1.c Size

There are various perspectives with relevance to size; market share, number
of sub-labels and size of staff.  Here are the most relevant comparisons
between Sony and UMVD with relevance to size.

*Market share*

According to Nielsen SoundScan, the company that tracks retail sales of
music,  out of 100% of the market base the combined share of Sony/BMG and
UMVD are as follows:

| | | |
|---|---|---|
| UMVD | 31.71% | (2005) |
| SONY/BMG | 27.45% | (2005) |
| BMG | 11.78% | (2005) |
| SONY | 15.67% | (2005) |

While it is tempting to point out the obvious, that UMVD has far greater
market share than Sony alone, or only slightly more market share when
combing Sony with BMG, this does not give us the entire picture.  Looking at
the chart on page 14 of the Supporting Documents you can see that if you
break apart the comparison by individual Parent Labels, the picture looks a
bit different. The Distributors' main contenders end up in almost a dead tie
for market share; Sony's top Parent Label, Columbia is almost neck-in-neck
with UMVDs top Parent Label Interscope, commanding 6.12 and 7.03 percentage
points respectively.

When it comes to artists in the top 200, Sony's top Parent Label Columbia
has 19 and UMVD's Parent Label, Def Jam has 18. In total numbers Sony as 56
artist in the top 200 and UMVD 77 artists. But again, this by itself does
not tell us which one is "bigger" as some artists have multiple releases and
some only have one or two.  The best we can say about this type of
comparison is that each Distributor seems to be very successful at
dominating about 25% of the positions in the Billboard Top 200 charts.

And if one looks only at digital downloads for 2004 Sony and UMVD are neck
and neck with each commanding exactly 30% of the market.  In 2005 UMVD
pulled ahead slightly with 33.27% to Sony's 26.61%.  But there is every
reason to believe that this statistic will swing a few points in either
direction year after year.



© July 3rd, 2006

These statistical differences are inconsequential and put both major Distributors at an almost photo-finish in terms of overall market share. When comparing to other Big Four numbers it's apparent that Sony/BMG and UMVD are the market leaders almost tied for first place, with WMG (WEA) and EMI in a distant second place and third place respectively.

*Lateral Integration*

Another characteristic of being a Big Four is having support functions that are laterally integrated. Sony has both Movie and TV divisions to compliment its record company. UMVD had Universal Studios until they parted ways in 2005. WMG had both their record division and their movie division, Warner Brothers, until they too parted ways in 2005. As of today Sony has the distinction of being the only laterally integrated Big Four.

**Relevant Conclusion:** Sony and UMVD maintain significant and almost equal footprints in the landscape of the retail music business. Both have dominant presence in the pop charts and about an equal number of Parent Labels, employees, artists, etc., under their control. Both have also had almost identical lateral integration of support functions (movie and TV divisions).

## 1.2 Conclusion: Is It Apples to Apples?

Understandably, each company has had slightly different sales figures and acquisitions. However, the difference is inconsequential and basically like saying, to use a cliché, that UMVD is a 500 pound gorilla and Sony is 490 pound gorilla. (All the other "major gorillas" are less than 100 pounds.)

When I began this analysis my goal was only to assess whether Sony could likely achieve the same number of sales of Ashanti records as UMVD. The answer to that question is "yes." However, the sales statistics of the two companies revealed rather interesting data that poses a more targeted question which is very relevant to this case: are Sony and UMVD the same in terms of performance and success with artists like Ashanti; a female R&B singer in her 20s catering to a demographic of 17-35 year olds?



© July 3rd, 2006

# Section 2: What If Ashanti Had Signed To Sony Instead Of Universal?

## 2.1 Comparison of Ashanti to Sony Equivalent Artists

In the category of female R&B singers Ashanti is considered to be one of UMVD/IDJ's best selling new female artists, with over 6.2 million albums sold to date. If her success continues, IDJ can look forward to the same kind of sales numbers that Mary J. Blige (also a UMVD artist) has produced: over 18 million album sales spread out over 8 album titles. This comes out to about 2 million units per album title which is the same sales-rate as Ashanti's.

To find a relative comparison on Sony we can eliminate artists like Mariah Carey who holds the world's record for LPs sold in this genre. Comparisons to her or Whitney Houston, also on Sony/BMG, would not be fair since they have long established histories in the R&B market stemming back into the 1990s.

The best comparison in my opinion would be Beyonce or Alicia Keys. Both were developed in exactly the same economic climate and at the same five-year period (1998-2003) as Ashanti. Their markets are identical and their ages are even quite close.

Even retail outlets seem to agree with this comparison. On Amazon.com, if you go to Ashanti's product page, Amazon's first choice for their "if you like Ashanti, you may also like" selection is Destiny's Child/Beyonce. And on Barnes & Noble's "people who bought Ashanti also bought" link, Beyonce is the only Sony artist indicated.

Other relevant Sony comparisons might be Jennifer Lopez or a new artist, named Ciara, who ironically, like Ashanti, was also developed originally by a Noontime subsidiary (Sho Nuff) which is owned by one of Noontime's producers Jazzy Pha.

## 2.2 Additional Capital Based On Lateral Integration

Using lateral integration as one comparison we see that Sony artists, Lopez, and Beyonce have expanded their prestige by starring in major motion pictures. (Lopez credits are numerous. Beyonce has stared in *Auston Powers*, *White Chicks* and *Taxi*. All of which were considered financial successes.)

Alicia Keys has appeared in several films as well, although not to the extent that Lopez and Beyonce have. Key's film credits include, *Smoking Aces*, *Nanny Diaries* and *American Dreams*.



©July 3rd, 2006

Ashanti meanwhile has not found a single film vehicle. This could be because of UMVD's departure from their movie division while Sony has maintained theirs to date.

## 2.3 Additional Capital Based On Record Sales

While UMVD has what is known as "street cred" for garnering the respect of the music fans and people in the business as the "R&B label," Sony's sales numbers more readily deserve this distinction.

A surprising pattern emerges when comparing top R&B female artists from both Sony and UMVD. The chart on pages 18 and 19 of the Supporting Documents clearly shows that a female R&B artist being distributed by a Sony label has an almost 3:1 success rate in the area of album sales over an identical type of artist being distributed on UMVD.

And even if one would take issue with a comparison to Beyonce, a comparison of the top four female R&B artists on both Sony and UMVD reveals the same result, almost a 3:1 sales differential. Female R&B singers marketing to the 17-35 year-old demographic on Sony sell about 3.2 million units per album, compared to UMVD's artists of the same type who sell only about 1.2 million units per album; an astounding difference of over 270%.

**Relevant Conclusion:** Based on both sales data and lateral integration it seems rather obvious that had Ashanti signed with a Sony distributed label with the same leverage as IDJ on UMVD, she likely would have faired far better in terms of prestige and album sales.

Noontime and Murder, Inc., are as we have seen in the previous section, parallel in terms of development and track record for aggregating talent. And IDJ and its Sony counterpart, Epic, are both Parent labels of equal standing. Therefore it's reasonable to conclude that Ashanti would likely be holding the place in the Sony catalog that Beyonce currently holds.



© July 3rd, 2006

## 3.0 Final Conclusions: Would Ashanti Have Earned More On Sony?

There is little room for doubt that Sony and UMVD are virtually identical and that had Ashanti stayed with Noontime she would have been distributed through Sony.

Through increased market share from Sony's greater success at penetration of the R&B market and Sony's lateral integration in film, however, she probably would have been exposed to opportunities in motion pictures as comparable Sony artists have and as a net result realized about double the earnings that she presently manifests.

It is, therefore, the opinion of this report that any accounting using Universal as a proxy for Sony in this case is more than reasonable and may very likely even be understating the financial results for Ashanti.

Respectfully Submitted,

Moses Avalon, July 3rd, 2006



© July 3rd, 2006

### Professional Biography of Moses Avalon

### DIGEST

Mr. Avalon began his career as a New York record producer and recording engineer. His combined work with Grammy® award-winning recording artists has earned him several RIAA Platinum records. Today he is an artist's rights activist and the author of a top selling music industry reference, *Million Dollar Mistakes* and also *Confessions Of A Record Producer* which is required reading in the music business curriculum of many schools, including UCLA, Loyola Law School and NYU. Mr. Avalon has also acted in an advisory capacity to the **Senate Judiciary Committee** (Sacramento) in their campaign to help legitimize areas of the music business and is a court recognized music business expert in California, Florida and Puerto Rico. His award winning website which discusses controversial issues in the music business and his advocacy efforts can be visited at www.MosesAvalon.com. His TV appearances include Bill O'reilly's *No Spin Zone* and CNN's *For the Money*, where he has commented on issues regarding the state of the music industry. His syndicated newsletter, MOSES SUPPOSES, which features informed editorials on the inner workings of the music business, reaches thousands of subscribers each month.

### EXPANDED

Moses Avalon is currently a top-selling author of music business books and educational tools in the US music industry. He is also a sought-after consultant and artists' rights activist who has lectured about the music business at Harvard Law, NYU, UCLA, and dozens of other venues. (List below)

Mr. Avalon began his career by producing and engineering records for several major and independent labels. His combined work with Grammy® award-winning recording artists has earned him several RIAA Platinum record awards. His soundtrack compositions have been used in films that went on to win outstanding achievement awards at Cannes, The New York Expo and WorldFest.

In 1997 Mr. Avalon noticed that all the "how-to" books on the music industry were written by attorneys and were not accessible to musicians. He took the opposite approach.

His first book, *Confessions of a Record Producer: How To Survive the Scams and Shams of the Music Business,* released in September 1998, still sells in the top 20% of all books on Amazon.com and is part of the music business curriculum in many schools. Including UCLA, Loyola Law School and NYU. It is currently in its 3rd Edition.

In the fall of 2001 Mr. Avalon released a follow-up book, *Secrets of a Negotiating a Record Contract: The Musician's Guide to Understanding and Avoiding Sneaky Lawyer Tricks*

His third title, *Million Dollar Mistakes, Steering Your Music Career Free of Lies, Cons and Catastrophes and Landmines* was released in January of 2006.

Mr. Avalon was the first non-attorney to lecture on the ins and outs of recording contracts at the Chicago Bar, and both the Los Angeles and Florida Continuing Legal Education (CLE) groups. He has been a featured guest in over 100 national radio interviews and his newsletter, *Moses*



© July 3rd, 2006

*Supposes*, which presents informed editorials on the inner workings of the music business, reaches over 11,000 subscribers—and, through syndication, over 50,000 readers.

He has created a coveted industry workshop for artists, producers, managers, and small label owners, awarding 13.5 CLE credits (and 4 ethics credits) to all attending attorneys.

He is an active lecturer around the world, CEO of **The Moses Avalon Company** and writes books about the music industry, as well as other topics.

In the past four years The Moses Avalon Company (MAC) also helped three government agencies put pressure on the major labels, resulting in new laws to protect artists and consumers.

Some of Mr. Avalon's more noted advocacy efforts are:

- In September of 2004 Mr. Avalon, was asked by a European Performing Rights Organization **SENA** to be the exclusive facilitator to help locate US artists who were owed approximately $1,000,000 in undistributed royalties. This unusual trust on the part of PRO resulted in US artists receiving long over-due money earned from European performances.

- In August 2003 Mr. Avalon, via articles and community pressure, focused on several online companies that fraudulently took exclusive rights from artists, while offering to distribute their music through **Apple iTunes**. After four months of consistent attention, one such company announced that they intend to return $200,000.00 to their clients and admitted that no actual deal with **iTunes** existed at the time in which they took the money.

- In September 2002 Attorney Generals in New Jersey and California used Mr. Avalon as a noted consultant to help build a case against **RIAA**-affiliated labels, regarding price-fixing of CDs in retail chains. This effort resulted in the return of over $150,000,000.00 in cash and goods to consumers from major labels.

- In August 2002 the **Senate Judiciary Sub-Committee on Record Industry Accounting Practices** spoke with and quoted Mr. Avalon in their preparatory brief to the committee. This information was used to impeach the RIAA at the Sacramento hearing, and has resulted in much attention on reform in the area of artist royalty reporting.

- In February 2002 a Moses Supposes article drew out a "secret" agreement between the **Harry Fox Agency** and the **RIAA**. The morally-questionable agreement to create a blanket license for internet use had the potential to deprive songwriters of millions in royalties. This focused much attention on the conflict of interest created buy RIAA ownership of SoundExchange, the agency chosen to collect and distribute these royalties. SoundExchange is now separated from RIAA.

- In March 2001 a Moses Supposes article exposed **Pacific Coast One-Stop**, a California Distributor responsible for default of payment for the sale of millions of records. Pacific was forced out of business five months later.



© July 3rd, 2006

## EXPERT WITNESS

As an expert witness Mr. Alavon's testimony has contributed to in the following cases:

| Case Name | Code | Location/date |
|---|---|---|
| M&J of Miami Inc d.b.a Live Shot Productions v. Outler | Civil No. 97-27097 Judge Alan Postman Applet style 717 SO. 2D 620 (fla 3rd dca. 1998) | Dade County Fla. (1998) |
| Serramalera v. Veroka | [will provide shorty] | LA County California (2003-4) |
| Cruz v. Sony Discos, Inc | Civil No. 02-2857 | Puerto Rico (2003) |

The additional references below are categorized by:

1) Press
2) Live Appearances

## PRESS

Mr. Avalon has been quoted in articles appearing in:

Wall Street Journal
USA Today
Daily Herald (Chicago)
Miami Herald
Baltimore Sun
LA Weekly
New Times
Knoxville News
San Francisco Chronicle
Daily Business Review
Industry Standard
TheWhiz.com
WCPO TV- CinciNow
Corpus Christi Caller Times

## APPEARANCES:

### Personal appearances, Conferences and Seminars as a featured speaker:

Royal Conservatory at the Hague (February 2005)
Pacifica University Music Summit
Harvard Law School (Key-Note)
New York University Law School
Ohio State Bar Association



© July 3rd, 2006

San Francisco State University
Bill O'Reilly's No Spin Zone
Austrian-Asian Music Conference
Global Media Summit
Mobile Beat Conference
Latin Alternative Music Conference
Chicago Bar
ASCAP
Elmhurst College
University of Miami
Internet Entertainment Expo
Southeastern Sports & Entertainment Law Conference
Winter Music Conference - Miami Beach
North American Country Music Seminar
Miami Book Fair International

Books and Music Stores Nationwide:

Barnes & Noble
Borders
Liberties
BookSoup - Los Angeles
Mars Music
University of Miami School of Music

Television Appearances

Bill O'reilly's *No Spin Zone*
CNN – *In The Money with Jack Cafferty*

National Radio Interviews:

| Station | Host |
|---|---|
| WFLA AM TampaBay, Fl | Jack - Tedd - Sharon |
| WBZ, Boston, MA | Jordan Rich |
| WINZ, Miami, FL | Julie Stampler |
| WLRN Miami, FL | Ed Bell |
| WFSK, Nashville,TN | Washington Dobbins |
| KXTQ, Dallas,TX | Monica Marcues |
| KPFK, Los Angeles, CA* | Sam Brown (For the Record) |
| KCLU, S.Calif | Jon O'Brien |
| WKQX Chicago | Mancau |
| WCCO, Minneapolis | Brad William |
| KCPS, Burlington IA | Fred Hoffman |
| | |
| KYYS, Kansas City | Max Floyd |
| WBSM, Boston, MA | Pete Braley |
| KVSF, Santa Fe, NM | Marion Lynch |
| WMGI, Indianapolis, IN | Coleen Kaye |
| WSPD, So. Michigan | Pat Brogan |
| KHTT, Tulsa OK | Andy Barber |



© July 3rd, 2006

| | |
|---|---|
| WMRN, Columbus, OH | Joe Suarez |
| KBCO, Denver, CO | Bret Sanders |
| KVSF, Santa Fe, NM | Marlon Lynch |
| WJON, St. Cloud, MN | J.G. Preston |
| WRSC, Penn State U | Allen Barger |
| WKDR, Burlington OH | Kevin Ohl |
| WSPD, So. Michigan | Pat Brogan |
| WBAB, Long Island NY | Bob Buchmann |
| KHTT, Tulsa OK | Andy Barber |
| WBSM, Boston, MA | Pete Braley |
| WKPE, South East Mass | Dean Peachy |
| KODS, Reno, Lake Tahoe NV | Wild Bill |

\* Regular featured guest.



© July 3rd, 2006

## Appendix i:

## Documents Reviewed in Connection with This Report

**Contracts:**

- ➢ Ashanti/Noontime Production Agreement
- ➢ Deal Memo T.E.A.M.-Ashanti
- ➢ Exclusive Services Agreement T.E.A.M. - Ashanti
- ➢ G. Parker Sony - Noontime Agreement
- ➢ IDJ Murder, Inc. JVA Agreement (redacted)
- ➢ Producer Agreement Parker - Noontime
- ➢ Production Agreement Ashanti- Noontime Short Form
- ➢ Release Agreement Ashanti - Noontime
- ➢ Release Agreement T.E.A.M. - Ashanti
- ➢ Sony Noontime Agreement

**SoundScan and Other Marketing Data**

- ➢ 1996 Year End Marketing Report US Recording Shipments - SoundScan
- ➢ Nielson Report for Music Sales 2005
- ➢ 2006 SoundScan Reports for the following artists:

  Ashanti

  Beyonce

  Destiny's Child

  Mary J. Blidge

  Jennifer Lopez

  Alicia Keys

  Ciara

  Christina Milian

  Rihanna

**Other Reports and Documents**

- ➢ Ashanti Bio from All Music.com
- ➢ Discography of G. Parker



© July 3rd, 2006

- Seymour Straus' Report titled: Calculation of Amounts Due T.E.A.M.
- Hon. Judge Jed S. Rakoff, U.S.D.J. decision titled and dated: T.E.A.M. entertainment, inc., plaintiff, -v- Ashanti Douglas and Tina Douglas, defendants. 04 civ. 1552 (JSR)
- Top 20 Accounts UMVD 1998-2004
- Sony Retail Accounts Top 50

- Billboard Article titled: Words & Deeds
- Billboard Article titled: Atlantic Pacts To Provide Resources For Noontime
- Billboard Article titled: THE RHYTHM AND THE BLUES: The Return Of Creativity, 'Real R&B,' And Artists With True Staying Power
- Billboard Article titled: Rhythm & Blues: Hicks & Co. Keep Busy
- Billboard Article titled: FOUR FRIENDS ON THE FAST TRACK

## Other Referenced Sources

- Book: Confessions of a Record Producer 3rd Edition 2006 published by Backbeat Books Ca. Author: Moses Avalon



© July 3rd, 2006